## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LARRY POLICKY, | ) | 4:05CV3212 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| CITY OF SEWARD, NEBRASKA, | ) | |
| and CRAIG SHOOK in his individual | ) | |
| and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Early in the afternoon on October 23, 2004, the volunteer rescue squad for the City of Seward, Nebraska, received a call for assistance at the home of the plaintiff, Larry Policky, and his mother. The first to respond were the captain of the rescue squad, Lisa Kimsey, and her husband, James Kimsey. Upon arriving at the Policky residence, the Kimseys were invited inside by the plaintiff's mother, who stated that her son (who was then 58 years old) was "acting funny" and had not left his room for two days. Lisa Kimsey knew that the rescue squad had been to the Policky residence on prior occasions because of diabetes-related emergencies involving the plaintiff.

After speaking with Mrs. Policky, the Kimseys went to the plaintiff's bedroom, announced themselves, and opened the door. Mr. Policky, who was in bed, told them to leave him alone. He refused to be examined. According to Mr. Policky, he told the Kimseys that he had seen his doctor the previous day and had been taken off a prescription medicine (Zocor) that had been causing sleep disturbances, and that he did not require any assistance from the rescue squad. He also states that he knew he was not having an insulin reaction because he had tested his blood sugar level that morning. According to Lisa Kimsey, however, Mr. Policky was cursing and yelling

at her and her husband to get out of his house.  The plaintiff admits that he was "a little upset" because he had told his mother 3 or 4 times not to call the rescue squad, and that he "raised [his] voice" while talking to the Kimseys, but he denies yelling at them or using any profanity.  (Policky Affidavit Exhibit B (filing 29-4), at 4.) [1]

In any event, the Kimseys closed the bedroom door and returned to the living room, where they determined to call the police to request assistance.  Lisa Kimsey thought that Mr. Policky appeared confused and combative, and was concerned that he might be having a diabetic reaction.  She was  concerned that Mrs. Policky might be in physical danger because the plaintiff was so angry, and she was also concerned for her own safety.  About this time 3 more members of the rescue squad arrived with an ambulance, but they stayed outside the house while awaiting the police.

The defendant, Craig Shook, a member of the Seward Police Department, arrived 5 to 7 minutes later and conferred outside with Lisa Kimsey.  After obtaining Mrs. Policky's permission to enter the house, Officer Shook, accompanied by James Kimsey and another member of the rescue squad, Chad King, went to the plaintiff's bedroom.  Officer Shook knocked on the door, identified himself, and asked Mr. Policky to come out and talk with him and the paramedics.  Mr. Policky refused and demanded that everyone leave the house.  According to Officer Shook, the plaintiff "began screaming through the door that he did not need medical treatment and that we should 'Get the fuck out of here[,]' . . . that this was all his mother's fault and that she didn't know what she was talking about[.]" (Shook Affidavit (filing 21-2), ¶ 4).

---

[1] Exhibit B is a transcript of a recorded statement that Mr. Policky gave to the City's insurance adjuster.  Mr. Policky has since sworn that "[his] responses to [the adjuster's] questions are truthful."  (Policky Affidavit (filing 29-2), ¶ 11.)  He also swears that the exhibit is a "true and accurate copy" ( id.), but I note that two pages of the transcript (pages 5 and 7) are missing.

None of this is disputed by Mr. Policky.[2]  In fact, he admits to being "really upset" that the rescue squad members had called the police department for assistance after he had told them that there was nothing they could do for him.  (Policky Affidavit Exhibit B, at 2.)

According to Mr. Policky, he had retested his blood sugar level since talking to the paramedics and, finding that it was too high, was preparing to take insulin in the bathroom that adjoined his bedroom.  He states that he informed Officer Shook several times that he wanted to take insulin to lower his blood sugar level, but received no response or acknowledgment.[3]  Officer Shook has not refuted this, but

---

[2] Mr. Policky generally states that he "believe[s] that Officer Shook has been dishonest in an attempt to cover up his violation of my rights" (Policky Affidavit (filing 29-2) ¶ 9), but this mere statement of belief does not create a genuine issue of material fact.  See de Llano v. Berglund, 282 F.3d 1031, 1035-36 (8th Cir. 2002).

[3] In his statement to the City's insurance adjuster, Mr. Policky described his conversation with Officer Shook as follows:

> It was about 3 or 4 verbal exchanges between him and me, I didn't even know who it was, but I, you know, he identified himself as Officer John (sic) Shook, of the Seward Police Department, so I told him that I just wanted to take some insulin because I started, when my blood sugar started getting high or whatever and the stress from that situation, it just makes me uncomfortable and he wanted me to come out and he never acknowledged the fact that I requested that I just wanted to take my insulin, so like I said, we had, we had 3 or 4 verbally exchanges you know, him wanting me to come out and him not acknowledging anything to my questions as far as taking insulin to bring that blood sugar down.

(Policky Affidavit Exhibit B, at 2.)  In the claim form that he submitted to the City, Mr. Policky described the conversation this way:

simply states that Mr. Policky told him in response to questioning that he had not eaten for two days.

After conversing with Mr. Policky for a few minutes, Officer Shook returned to the living room and talked with Mrs. Policky. She confirmed that her son had not eaten for two days, and stated that he had been having some health problems lately.

Officer Shook next phoned his lieutenant to inform him of the situation, and afterward told Mrs. Policky that he was going to try to get her son out of the bedroom so that he could be examined. He also stated that it might be necessary to restrain Mr. Policky to accomplish this. When Mrs. Policky gave her approval to this plan, Officer Shook, James Kimsey, and Chad King returned to the plaintiff's bedroom.

Officer Shook states that he knocked on the bedroom door and announced himself again, and that the plaintiff "again began using profanities yelling that he was fine and demanding that [everyone] leave the house." (Shook Affidavit, ¶ 8.) Officer Shook then "said that [he] believed Mr. Policky was not behaving rationally and that he should be checked out by a paramedic or doctor to make sure he wasn't in danger[,]" to which "Mr. Policky again yelled that he was fine, to 'get the hell out of here,' and generally repeated what he had been yelling before." (Id.) Mr. Policky

---

Officer Don (sic) Shook started talking through the closed door. He wanted me to come out but I told him I wanted to take my insulin because of the high blood sugar. I got no response to that request and decline[d] to come out. After 2 or 3 more conversations, each time requesting the opportunity to take some insulin, the officer did not respond to that request [so] I remained seated on the stool in my bedroom (sic).

(Policky Affidavit Exhibit A (filing 29-3) at 2.) Although the claim form (Exhibit A) is signed, it does not qualify as an affidavit, nor has Mr. Policky subsequently attested to the truthfulness of the claim form in his affidavit. Even so, I have considered the claim form as if it were admissible evidence offered by the plaintiff.

does not mention this renewed exchange of words, but merely states that he "was sitting on the stool in [his] bathroom" and that when he looked up he saw Officer Shook standing "about 3 feet from [his] bathroom door . . . [with] a taser gun pointed at [him]." (Policky Affidavit Exhibit B.)  Officer Shook states that he drew his taser gun before opening the unlocked bedroom door and kept it pointed at the ground; that he and the two rescue squad members entered the bedroom and saw that Mr. Policky was in the bathroom, fully clothed, sitting on the toilet; that he put away his taser gun when he saw that Mr. Policky had nothing in his hands; and that he directed one of the paramedics to remove a knife or pair of scissors that was lying on a dresser in the bedroom.  Officer Shook denies that he ever pointed the taser gun at Mr. Policky.

At some point, Mr. Policky stood up and closed the bathroom door, locking it. He states that he was worried that Officer Shook was going to use the taser gun on him, and was especially concerned about this because he had undergone heart surgery only two months earlier and did not think that he could survive the electrical shock.

Officer Shook picked the lock and began to open the bathroom door, but Mr. Policky pushed it shut and locked it again.  Officer Shook picked the lock again and forced his way into the bathroom against Mr. Policky's physical resistance.  Officer Shook states that the plaintiff also attempted to push him away after the door was opened, but Mr. Policky denies this.

Officer Shook then grabbed Mr. Policky, turned him around, and pushed him down to a kneeling position.  Mr. Policky states that his back was painfully wrenched when he was forced to the floor, and that Officer Shook also put a knee into his back to handcuff him.[4]  Officer Shook states that he decided to handcuff Mr. Policky with

---

[4] Officer Shook admits that "[a]s Mr. Policky was standing up, he did say that his back hurt."  (Shook Affidavit, ¶ 15.)  Mr. Policky states he told Officer Shook "you wrenched my back."  (Policky Affidavit Exhibit B, at 3.)

his hands behind his back because there were needles on the sink that could be used as weapons. Mr. Policky also complains that the handcuffs were too tight.

The handcuffs were removed after Mr. Policky was walked to the living room and either before or after he was placed on a gurney and strapped down with the usual safety restraints. He was then transported to the hospital in the ambulance but was released after being examined in the emergency room.

The plaintiff's two-count complaint alleges (1) that the City of Seward was negligent, and is liable under the Nebraska Political Subdivision Tort Claims Act, because its police department "failed to supply proper policies to train Officer Shook with the proper procedures when using a taser gun, restraining Plaintiff with unreasonable force, and failing to train Officer Shook how to determine what facts and circumstances merit the use of force," and (2) that Officer Shook is liable under 42 U.S.C. § 1983 because "the Plaintiff's right to be free from unlawful searches or seizure of himself or to have his property damaged or taken from him without due process of law was violated contrary to the IV and XIV Amendments to the United States Constitution." (Filing 1, ¶¶ 26, 32.) Both defendants have now moved for summary judgment in a jointly filed motion.

On the constitutional tort claim, I will grant the motion in part and will deny it in part. That is, I will (1) dismiss all § 1983 claims alleged against the City, (2) dismiss all Fourteenth Amendment substantive due process claims alleged against Officer Shook, (3) dismiss the Fourth Amendment claim for unlawful arrest against Officer Shook, and (4) dismiss in part the Fourth Amendment excessive force clam alleged against Officer Shook, insofar as complaint is made about (a) his use of handcuffs and (b) his display of a taser gun. However, I will not dismiss the Fourth Amendment excessive force claim alleged against Officer Shook, in his individual capacity, insofar as complaint is made that he injured the plaintiff's back. On the negligence claim alleged against the City, the motion will be granted.

# I. DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party

has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

## A. Section 1983 Claim

I begin my analysis with the section 1983 claim because it provides the jurisdictional basis for the plaintiff's action. As a preliminary matter, I note that Officer Shook is sued in both his individual and official capacity. Suing Officer Shook in his official capacity is the legal equivalent of suing the City of Seward directly. See Bankhead v. Knickrehm, 360 F.3d 839, 844 (8th Cir.), cert. denied, 543 U.S. 818 (2004). Thus, I will treat the section 1983 claim as having been alleged against both defendants, which is also consistent with the parties' briefing of this claim. I will start with Officer Shook, who claims qualified immunity.

### 1. Officer Shook

Qualified immunity protects government officials from the costs of trial and the burdens of broad discovery unless their discretionary acts violated clearly established statutory or constitutional rights. Wilson v. Northcutt, 441 F.3d 586, 590 (8th Cir. 2006) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982)). A defendant's claim of qualified immunity is determined by an objective standard. Id.

In ruling on a qualified immunity issue, courts must apply a two-part inquiry. First, a court must determine whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If a "violation [can] be made out on a favorable view of the parties' submissions," the reviewing court must then ask whether "the right was clearly established . . . in light of the specific context of the case." <u>Id.</u> "For a right to be considered clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Lawyer v. City of Council Bluffs</u>, 361 F.3d 1099, 1103 (8th Cir.2004) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

<u>Plemmons v. Roberts</u>, 439 F.3d 818, 822 (8th Cir. 2006).

"[T]o withstand a motion for summary judgment on qualified-immunity grounds, a plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the government official knew or should have known that his alleged conduct violated this clearly established right." <u>Radloff v. City of Oelwein</u>, 380 F.3d 344, 347 (8th Cir. 2004) (quoting <u>Habiger v. City of Fargo</u>, 80 F.3d 289, 295 (8th Cir.1996)), <u>cert. denied</u>, 543 U.S. 1090 (2005). On the other hand, if a genuine dispute exists concerning predicate facts material to the qualified immunity issue,[5] then the defendant is not entitled to summary judgment on that ground.

---

[5] "Predicate facts" include only the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions. <u>Pace v. City of Des Moines</u>, 201 F.3d 1050, 1056 (8th Cir. 2000). Once the predicate facts are established, for the purposes of qualified immunity, there is no such thing as a "genuine issue of fact" as to whether an officer "should have known" that his conduct violated constitutional rights. The conduct was either reasonable, or it was not, which is a determination of law that should be made at the earliest possible stage in litigation. Thus, when there is no dispute among the parties as to the relevant facts, a court should always be able to determine as a matter of law

Plemmons, 439 F.3d at 822.

Determining whether a constitutional right was clearly established "is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005) (internal quotations and citations omitted). "A constitutional right is clearly established if '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Creighton, 483 U.S. at 640). This definition "requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." See id. (quoting Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004).

### a. Unlawful Arrest Claim

Mr. Policky first claims that he was unlawfully taken into custody. Although he argues that this constitutes both a Fourth Amendment unlawful arrest claim and a Fourteenth Amendment substantive due process claim, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998) (quoting United States v. Lanier, 520 U.S. 259, 272, n. 7 (1997)). I conclude that Mr. Policky's claim is "covered by" the Fourth Amendment's prohibition against unreasonable seizures, made applicable to the states through the Fourteenth Amendment. See Tinius v. Carroll County Sheriff Dep't, 321 F. Supp. 2d 1064, 1073 (N.D. Ia. 2004) (officers' actions in seizing the plaintiff, transporting him to the hospital, and restraining him during an involuntary catheterization were "required to be evaluated under the rubric of Fourth Amendment reasonableness").

---

whether or not an officer is eligible for qualified immunity—that is, whether or not the officer acted reasonably under settled law given the particular set of facts. Id.

Officer Shook argues that there was no unreasonable seizure in this case because he acted pursuant to the Nebraska Mental Health Commitment Act, which permits law enforcement officers to take mentally ill and dangerous persons into emergency protective custody when they pose a substantial risk of serious harm to themselves or others.[6] See Neb. Rev. Stat. § 71-919. However, there is no evidence that Mr. Policky was "mentally ill" or that he was even perceived to be "mentally ill." See Neb. Rev. Stat. § 71-907 ("Mentally ill means having a psychiatric disorder that involves a severe or substantial impairment of a person's thought processes, sensory input, mood balance, memory, or ability to reason which substantially interferes with such person's ability to meet the ordinary demands of living or interferes with the safety or well-being of others.") (emphasis supplied). Officer Shook may have been led to believe that Mr. Policky was having an insulin reaction, but, to my knowledge, there is no Nebraska statute that specifically authorizes police to take diabetic individuals into emergency protective custody.

Although not discussed by the parties, a "community caretaker" exception has been applied to the Fourth Amendment in a variety of contexts since the Supreme Court's decision in Cady v. Dombrowski, 413 U.S. 433, 441 (1973) (observing that local police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."). It is fair to say that the exact parameters of this "community caretaker" exception are still largely undefined. See Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (because the availability of the community caretaking function as an alternative to "a reasonable suspicion of criminal wrongdoing" under Terry v. Ohio, 392 U.S. 1 (1968), is still a "subject of debate" in the courts, the defendants were entitled to qualified immunity on the plaintiff's Fourth Amendment illegal detention

---

[6] Reliance on a state statute may render an official's conduct objectively reasonable, but it does not make the official's conduct per se reasonable. See Roska v. Sneddon, 437 F.3d 964, 971 (10th Cir. 2006).

claim); <u>Tinius</u>, 321 F. Supp. 2d at 1078 (it was not clearly established whether community caretaker exception applied to officers' actions in restraining plaintiff during a medical procedure that was being conducted for non-investigatory purposes).

In this circuit, however, there is a definite standard regarding the forced, warrantless removal of a person from his own home for "community caretaking" reasons. <u>See</u> <u>Collins v. Bellinghausen</u>, 153 F.3d 591, 596 (8th Cir. 1998) (holding that police officers acting at the request of a social worker were entitled to qualified immunity when they removed a frail, elderly woman from her home because they had sufficient information to lead them to reasonably believe that the woman was in need of immediate aid). <u>See</u> <u>also United States v. Nord</u>, 586 F.2d 1288, 1290 (8th Cir. 1978) (routine community caretaking functions of police include "responding to calls to assist persons in need of immediate aid"). In <u>Collins</u>, the Court of Appeals expressly relied upon <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978), in which the Supreme Court observed that "[n]umerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." (Footnoted citations omitted.) On the basis of the Court of Appeals' application of the <u>Mincey</u> "exigent circumstances" exception in <u>Collins</u>,[7] I must conclude that it was clearly established as of October 23, 2004, that the Fourth Amendment prohibited Officer Shook from entering Mr. Policky's bathroom and taking him into custody <u>unless</u> the officer reasonably believed that Mr. Policky was in need of emergency medical care.[8]

---

[7] To be clearly established, there need not be a case decided on all fours with the present factual circumstances. <u>Wilson v. Lawrence County</u>, 260 F.3d 946, 951 (8th Cir. 2001). Rather, it need only be apparent from pre-existing law that the conduct is unlawful. <u>Id.</u> (citing <u>Anderson</u>, 483 U.S. at 640).

[8] The existence of exigent circumstances is an objective analysis focusing on what a reasonable, experienced police officer would believe. <u>United States v. Williams</u>, 431 F.3d 1115, 1118 (8th Cir. 2005).

Although it developed that Mr. Policky did not, in fact, require any medical treatment, "[a] determination of whether a legal [seizure of his person] occurred focuses on whether [Officer Shook] acted with a reasonable belief that . . . exigent circumstances existed, not on whether . . . [they] actually existed." Radloff, 380 F.3d at 348. There is no dispute that Officer Shook was responding to a request for assistance from rescue squad personnel, and that he was advised by the squad captain that Mr. Policky "had been screaming and cursing and that he had been yelling about his mother." (Lisa Kimsey Affidavit (filing 21-3), ¶ 9.) Ms. Kimsey also told Officer Shook that "she was concerned that Mr. Policky may be going into diabetic shock, or that his actions may be caused by diabetes." (Shook Affidavit, ¶ 3.) Officer Shook also spoke to the plaintiff's mother, who approved his plan "to get Mr. Policky out of his bedroom so he could be examined," and, if necessary, "to restrain Mr. Policky in order to accomplish this." (Shook Affidavit, ¶ 4.)

While there is a dispute concerning the truthfulness of the statements that were made to Officer Shook by Lisa Kimsey and by Mr. Policky's mother, and while Mr. Policky claims that he provided pertinent information to the Kimseys regarding his state of health does not appear to have been shared with Officer Shook, I conclude that Officer Shook could reasonably believe, based on the information that was provided to him by others, and also based on his own contacts with Mr. Policky, that emergency medical care was required despite Mr. Policky's repeated refusals to be examined.[9] Thus, I determine that Officer Shook is entitled to qualified immunity on the Fourth Amendment unlawful arrest claim.

---

[9] Even accepting as true the plaintiff's statement that he repeatedly told Officer Shook that he wanted to take insulin because his blood sugar was too high, this may only have served to reinforce Officer Shook's belief that Mr. Policky needed medical attention.

### b. Excessive Force Claim

The plaintiff also contends that Officer Shook used excessive force while taking him into custody.  As to this additional Fourth Amendment claim, I find that there are material facts in dispute regarding the reasonableness of the officer's conduct in physically subduing the plaintiff, and that summary judgment cannot be granted on qualified immunity grounds with respect to such conduct.   On the other hand, I conclude that no constitutional violation occurred in connection with the officer using handcuffs or drawing a taser gun, and that summary judgment should be granted with respect to these precautionary measures.

### i. Physical Contact

Among other things, there is a genuine dispute as to whether Mr. Policky tried to push Officer Shook away after the bathroom door was forced open, which might be the only possible justification for the officer's conduct in shoving the plaintiff to his knees and allegedly causing a back injury.  Indeed, the defendants argue that "[i]t was only after Mr. Policky initiated physical contact with Officer Shook by trying to push him away from the bathroom door that he restrained Mr. Policky." (Filing 22, at 17.)   While admitting that he "resisted" while Officer Shook was pushing against the bathroom door (Policky Affidavit Exhibit A, at 2), Mr. Policky states that he "did not initiate any contact" after the door was opened.  (Policky Affidavit Exhibit B, at 5.)  He also states that his back "still hurts because of Officer Shook's forceful restraint," that he "often [has] to take pain pills to cope with the pain," and that he had "seen a chiropractor for this pain, but . . . was unable to continue treatment due to the expense involved." (Policky Affidavit, ¶ 5.)

Excessive force claims occurring in the context of seizures are analyzed under the Fourth Amendment, using its reasonableness standard.  Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006).   "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, 'the test is whether the

amount of force used was objectively reasonable under the particular circumstances.'" Littrell, 388 F.3d at 583 (quoting Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir.1994)). The reasonableness of a particular use of force is analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). Thus, the analysis must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

Not every push or shove by an officer violates the Fourth Amendment. Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908 (8th Cir. 2005) (tackling intoxicated individual to prevent him from injuring himself was not unreasonable) (quoting Graham, 490 U.S. at 396). In addition to the circumstances surrounding the use of force, the result of the force may also be considered. See Littrell, 388 F.3d at 583.[10]

I conclude that Mr. Policky has presented sufficient proof in support of his claim, if believed, to allow a reasonable jury to find the degree of force used against him was not "objectively reasonable." He had committed no crime. He was upset and screamed at Officer Shook to leave him alone, but there is no evidence that he threatened anyone or posed a threat of injury to anyone other than himself, perhaps. He actively resisted Officer Shook's efforts to push open the bathroom door, but the

---

[10] In determining whether the amount of force used to effect an arrest was reasonably necessary, jurors in this circuit are instructed to "consider such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether a reasonable officer on the scene, without the benefit of 20/20 hindsight, would have used such force under similar circumstances." 8th Cir. Civil Jury Instr. 4.10 (2005).

evidence is in conflict as to whether his resistance continued once the door was forced open. In this regard, it should also be remembered that Officer Shook was not alone; two paramedics accompanied him into the bedroom and three more were waiting outside the house. Finally, Mr. Policky claims that his back was seriously injured when Officer Shook pushed him to the floor and placed him in handcuffs.

As previously discussed, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step [in the qualified immunity analysis] is to ask whether the right was clearly established." Saucier, 533 U.S. at 201. This inquiry "remains distinct" from the analysis of the excessive force claim, id. at 204, but in this instance the result is the same. "Officer [Shook], as the party moving for summary judgment, 'must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions.'" Henderson, 439 F.3d at 503 (quoting Cross v. City of Des Moines, 965 F.2d 629, 632 (8th Cir. 1992)). He has not satisfied this burden.

The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures. Id. (citing Graham). While there may be some question as to whether a police officer acting in a "community caretaker" role is privileged to use the same amount of force to take a person into custody as when the officer is acting in a "law enforcement" role,[11] under a Fourth Amendment analysis the amount of force used

---

[11] In Wertish v. Krueger, 433 F.3d 1062 (8th Cir. 2006), a motorist having a diabetic reaction was pulled from his vehicle, pushed to the ground, and handcuffed after he failed to respond to officers' orders to exit his vehicle. It was held that the officers were entitled to qualified immunity because it was objectively reasonable for them to assume that they were dealing with a "belligerent drunk" rather than a person with diabetes. The same result was reached in Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005) involving similar circumstances. In each case, the officers' lack of knowledge concerning the plaintiff's medical condition was a deciding factor.

cannot be any greater in the former situation than in the latter.  See United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993) ("[A] person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for '[i]t is surely anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'") (quoting Camara v. Municipal Court, 387 U.S. 523, 530 (1967)).  As previously found, the evidence presented does not conclusively establish that the amount of force used by Officer Shook was objectively reasonable under the circumstances.  See, e.g., Henderson, 439 F.3d at 504 (plaintiffs' denial that he was resisting arrest when officer struck him in the leg and sprayed him in the face with pepper spray precluded granting summary judgment based on qualified immunity).

### ii.  Handcuffs

For the application of handcuffs to amount to excessive force, there must be something beyond minor injuries.  Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005) (citing Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir.2003)).  In this case, Mr. Policky only complains that he was handcuffed too tightly for a short while.  He claims that the handcuffs were painful, but he does not claim to have sustained any long-term injury as a result of the handcuffs.  This evidence is insufficient as a matter of law to establish a constitutional violation.  See Foster v. Metropolitan Airports Com'n, 914 F.2d 1076, 1082 (8th Cir. 1990) (plaintiff's allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, were not sufficient to support his claim of excessive force).  An "actual injury" must be shown to support an excessive force claim under the Fourth Amendment.  Hanig, 415 F.3d at 824 (citing Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995)).  See also Fuoss, 417 F.3d at 818 (de minimis injuries, including temporary and slight aggravation of pre-existing conditions, preclude a claim for excessive force).

"If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."

Wertish, 433 F.3d at 1066 (quoting Saucier, 533 U.S. at 201).  Thus, summary judgment will be entered with respect to the plaintiff's claim that the handcuffs were too tight.  To the extent that Officer Shook's actions in handcuffing Mr. Policky may have contributed to his alleged back injury, however, summary judgment will be denied for the reasons stated in the preceding section (regarding "physical contact").

### iii.  Taser Gun

I likewise conclude as a matter of law that Officer Shook's act of drawing a taser gun, and allegedly pointing it at Mr. Policky, did not constitute an excessive use of force.  In Edwards v. Giles, 51 F.3d 155, 157 (8th Cir. 1995), the Eighth Circuit held that an officer's conduct in drawing his gun and pointing it at the plaintiff, without any indication that he intended or attempted to fire the gun, did not rise to the level of a constitutional violation.[12]  If the act of drawing and pointing a gun loaded with bullets does not violate the Fourth Amendment, then the act of drawing and pointing a gun charged with electricity can hardly give rise to a claim of excessive force.  Thus, summary judgment will also be entered with respect to the plaintiff's allegations concerning the taser gun.

### c.  Property Damage Claim

The plaintiff further alleges that "his property [was] damaged or taken from him without due process of law" (Complaint, ¶ 32), and, in this regard, merely states without any further explanation that Officer Shook "scratched the heck [out] of [his] bathroom door." (Policky Affidavit Exhibit B, at 3.)  This appears to be nothing more than a common law tort claim that is not actionable under 42 U.S.C. § 1983.

---

[12] The Court of Appeals also found in Edwards that the because the plaintiff did not submit to the officer's authority when the gun was pointed at him, there was no seizure.  The same is true in the present case.

"[S]ection 1983 does not turn the Fourteenth Amendment into a font of tort law that supersedes the tort systems already available under individual state laws." Gregory, 974 F.2d at 1009. The guarantee of the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm" and "does not transform every tort committed by a state actor into a constitutional violation." See Hart v. City of Little Rock, 432 F.3d 801, 805 (8th Cir. 2005) (quoting Lewis, 523 U.S. at 848, and DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 202 (1989)). Suffice it to say that the incidental scratching of a bathroom door by a police officer attempting to perform his duties is not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. (quoting Lewis, 523 U.S. at 848 n. 8). Accordingly, summary judgment will be granted with respect to this property damage claim.

## 2. City of Seward

It is well settled the doctrine of respondeat superior is inapplicable to section 1983 claims. Vaughn v. Greene County, 438 F.3d 845, 851 (8th Cir. 2006). The City can only be held liable for the alleged violations of Mr. Policky's constitutional rights on an unconstitutional policy or custom theory[13] or on a failure to train or supervise theory.[14] See McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005).

---

[13] "Municipal liability under section 1983 is premised on the existence of two prerequisites: (1) a policy, practice, or custom must be attributable to the City through actual or constructive knowledge; and (2) the policy, practice, or custom must directly cause constitutional injury." Gatlin v. Green, 362 F.3d 1089, 1094 (8th Cir. 2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).

[14] "Under certain circumstances, a municipality can be liable under section 1983 for constitutional violations resulting from its failure to adequately train its employees." Gatlin, 362 F.3d at 1094. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. (quoting City of Canton v. Harris, 489

The plaintiff argues that the fact "Officer Shook informed his superiors about the situation, and still proceeded to violate Plaintiff's rights, is indicative of the fact that the Police Department had either a custom or a policy in place to deal with these kinds of situations in this fashion." (Filing 30, at 16.) However, no such inference can reasonably be drawn from the evidence presented—which simply shows that Officer Shook, following his first encounter with Mr. Policky, "called [his] lieutenant to inform him of the status of the situation." (Shook Affidavit, ¶ 6.)

A "policy" is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Hayes v. Faulkner County, 388 F.3d 669, 674 (8th Cir. 2004) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986)). It has not been shown that Officer Shook's lieutenant was a final policymaker, even assuming that he approved the use of force to take Mr. Policky into custody. Nor is there any evidence that a municipal "custom" was the moving force behind Mr. Policky's alleged injuries. A "custom" requires proof of "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" and "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct." Kuha v. City of Minnetonka, 365 F.3d 590, 604 (8th Cir. 2003).

Mr. Policky alleges in his complaint, as part of his state-law claim, that the City of Seward "failed to supply proper policies to train Officer Shook with the proper procedures when using a taser gun, restraining Plaintiff . . ., and . . . determin[ing] what facts and circumstances merit the use of force" (Complaint, ¶ 26), but he has presented no evidence in support of this allegation and has failed to demonstrate that the City of Seward has been deliberate indifferent in this regard. Thus, the City is

U.S. 378, 380 (1989)).

also entitled to summary judgment on the section 1983 claim.[15]

## B. State-Law Tort Claim

The state-law tort claim is brought against the City only. As discussed above, it is alleged that the City failed to provide proper training to Officer Shook. Although there is no evidence to support this allegation—and, indeed, the Seward Chief of Police has stated that "[a]ll City of Seward police officers are required to successfully complete basic and advanced training at the Nebraska Law Enforcement Training Center in Grand Island, or equivalent training from other qualified sources, and to receive supplemental training throughout their employment with the City of Seward" (Alan Baldwin Affidavit (filing 21-4), at 2)—the City merely contends that it is immune from suit under the Nebraska Political Subdivisions Tort Claims Act. I agree with this contention.[16]

The Act does not permit suit to be brought against a political subdivision for "[a]ny claim arising out of assault, battery, false arrest, [or] false imprisonment . . .." Neb. Rev. Stat. Ann. § 13-910 (LexisNexis Supp. 2005). A comparable provision of Nebraska's State Tort Claims Act was construed recently by the Nebraska Supreme

---

[15] In any event, the City has no liability under § 1983 for Officer Shook's using handcuffs, displaying the taser gun, or damaging the bathroom door, since these actions did not violate Mr. Policky's constitutional rights. See Schulz v. Long, 44 F.3d 643, 650 (8th Cir.1995) ( "It is the law in this circuit . . . that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located.").

[16] I agree based on the Act's "intentional tort" exception. I disagree with the City's alternative theory that Officer Shook was exercising a "discretionary function" when he took Mr. Policky into custody. The Act's "discretionary function" exception extends only to the basic policy decisions made in governmental activity. Hamilton v. City of Omaha, 498 N.W.2d 555, 559 (Neb. 1993) (police officer's actions were taken at the operational level and did not involve policy-level decisionmaking).

Court, in <u>Johnson v. State</u>, 700 N.W.2d 620 (Neb. 2005), to require dismissal of various negligence claims bought against the State (Department of Correctional Services and Omaha Correctional Center) "arising out of" the alleged sexual assault of an inmate by a guard.  It stated:

> Where the plaintiff's tort claim is based on the mere fact of government employment (such as a respondeat superior claim) or on the employment relationship between the intentional tort-feasor and the government (such as a negligent supervision or negligent hiring claim), the exception in § 81-8,219(4) applies and the State is immune from suit. . . . Johnson's causes of action against the defendants fall squarely within the second of the two enumerated instances; each are based upon the employment relationship between Johnson's alleged assailant and the defendants.  Thus, the intentional tort exception of § 81-8,219(4) applies and bars Johnson's action against the defendants.

<u>Id.</u>, 700 N.W.2d at 625 (citing <u>Sheridan v. United States</u>, 487 U.S. 392, 406-07 (1988) (Kennedy, J., concurring in judgment)).

The <u>Johnson</u> holding requires that the state-law tort claim be dismissed because the City's alleged negligent failure to train Officer Shook is directly related to his employment as a police officer and to his alleged intentional torts of unlawfully arresting and assaulting Mr. Policky.   In other words, the City is immune from suit under the Nebraska Political Subdivision Tort Claims Act.

## CONCLUSION

All claims will be dismissed except the Fourth Amendment claim that Officer Shook used excessive force against the plaintiff when he grabbed him, turned him around, pushed him to the floor, and handcuffed him.  This surviving claim relates only Mr. Policky's alleged back injury, and does not include his allegations that the handcuffs were too tight or that he feared for his life when he saw the taser gun.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (filing 20) is granted except insofar as it is claimed that the defendant Craig Shook is liable in his individual capacity for violating the plaintiff's Fourth Amendment rights by using excessive force that caused injury to the plaintiff's back, as to which claim the motion is denied.

May 25, 2006.                                    BY THE COURT:

                                                 s/ *Richard G. Kopf*
                                                 United States District Judge